MELINDA HAAG (CABN 132612)
United States Attorney

MIRANDA KANE (CABN 150630)
Chief, Criminal Division

DENISE MARIE BARTON (MABN 634052)
Assistant United States Attorneys

   450 Golden Gate Ave., Box 36055
   San Francisco, California 94102
   Telephone: (415) 436-7200
   Fax: (415) 436-7234
   E-Mail: denise.barton@usdoj.gov

Attorneys for the United States of America

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, <br><br> Plaintiff, <br><br> v. <br><br> ELLA MAE SIMPSON, <br><br> Defendant. | No. CR 11-0832 SI <br><br> **MEMORANDUM IN REPLY TO DEFENDANT'S OBJECTIONS AND SENTENCING MEMORANDUM** <br><br> Date: December 14, 2012 <br> Time: 11:00 a.m. <br> The Honorable Susan Illston |

MEMO IN REPLY TO DEFENDANT'S OBJECTIONS AND SENTENCING MEMORANDUM,
CR 11-0832 SI

The defendant has made several objections in its Sentencing Memorandum, Objections to the Presentence Report, and Objections to the Oxycodone Equivalency Ratio in the Sentencing Guidelines. The United States has responded to certain of those objections in its previously-filed Sentencing Memorandum and responds to the remaining objections, it believes warrant a response, in this Reply.

A.   The United States Has Shown By a Preponderance of the Evidence That the Drug Quantities in Contest Are Attributable to the Defendant

The defendant has endeavored to minimize her role in the Conspiracy. Although the defendant has not clearly contested the use of the pills seized in Washington as relevant conduct in calculating the Guidelines in her Sentencing Memorandum or her Objections, she appears to have made the objection in the PSR. *See* PSR, ¶ 20. Therefore, the United States believes that the defendant is contesting that the amounts seized in the Western District of Washington on June 9, 2011 are attributable to her for purposes of relevant conduct. Notwithstanding the ambiguity regarding the Washington seizure, the defendant clearly contests that the large quantity of drugs in a freezer bag that were seized from her dresser drawer during the search of her home were not her drugs, but drugs belonging to another drug dealer who was staying in her house on the day of the search. *See Defendant's Objections*, p. 9 (¶ 26). As set forth in the *United States' Sentencing Memorandum* and herein, both of these quantities are properly attributable to the defendant. A defendant is accountable for all drug quantities which she aided and abetted directly, as well as all reasonably foreseeable drug quantities of her co-conspirators that were within the scope of the criminal activity that they jointly undertook. *See* U.S.S.G. § 1B1.3(a)(1)(B); *United States v. Ortiz*, 362 F.3d 1274, 1276-77 (9th Cir. 2004). As this Court is aware, in cases with contested drug quantities, "the district court at sentencing must find drug quantities by a preponderance of the evidence through sufficiently reliable information." *United States v. Gonzalez*, 528 F.3d 1207, 1214-15 (9th Cir. 2008)*(citing United States v. Kilby*, 443 F.3d

1135, 1141 (2006)).[1] To ensure that the Court has sufficient facts to make these findings at sentencing, the United States sets forth the following information.

1. *Pills Seized in Washington on June 9, 2011 Upon Whatley's Arrest*

The defendant has pled guilty to Conspiracy to Possess with Intent to Distribute and to Distribute oxycodone on dates between April 5, 2001 and June 9, 2011. With respect to co-defendant Whatley, from whom the pills were seized on June 9, 2011, in her pre-arrest statements, the defendant said that one group of individuals who transported drugs to Seattle was headed by her friend, co-defendant Whatley. She said that Whatley collected the pills in the East Bay and transported the pills to Seattle. She stated that prior to Whatley making the June 9, 2011 trip to Seattle, Whatley had left two bags with her. As set forth in the *United States Sentencing Memorandum*, on June 8, 2011, one day before the seizure in Washington, the defendant gave the CI pills to sell when the CI traveled to Washington with Whatley and thereafter, the defendant contributed additional pills to the trip. *See United States Sentencing Memorandum*, pp. 3-5 (under seal information). In addition, in pre-arrest statements, the defendant described to agents that there was a demand for oxycontin in Washington, that the street price of the drug was higher in Washington, and that there were several groups who transported drugs from the Bay Area to Washington. The defendant individuals involved in the scheme and described the methods of transportation used by the drug traffickers. She further admitted that she allowed these individuals to use her house as a stash house; that one of them had used her house for the past 6 months as a stash house; that she was paid for storing drugs (most recently $1,000); and that some of the drugs found in her home on the day of the search belonged to some of the Seattle-based traffickers. Her statements show her association with this

---

[1] The Court's findings may rely on hearsay, provided there is sufficient indicia of reliability for the hearsay evidence. *See United States v. Petty*, 982 F.2d 1365, 1369, *as amended by*, 992 F.2d 1015 (9th Cir.1993) (holding that "the Confrontation Clause does not apply at sentencing" and that hearsay statements may be used to determine drug quantity for sentencing purposes when accompanied by "some minimal indicia of reliability"); *see also United States v. Littlesun,* 444 F.3d 1196, 1199 (9th Cir.2006) (holding that Crawford does not alter the rule that hearsay, when accompanied by minimal indicia of reliability, is admissible at sentencing).

market, supporting a finding that she was involved in the attempted drug sale by co-defendant Whatley in the Washington area. By virtue of these actions, she was a co-conspirator, or at a minimum, aided and abetted the actions of this other group of Washington-based oxycodone traffickers.

The defendant's statements, her fronting drugs for the June 9, 2011 Washington trip, and the fact of her guilty pleas, including to Counts One and Four, present sufficiently reliable information for this Court to find that the drugs brought to Washington by Whatley for sale are properly considered as relevant conduct for purposes of calculating the Guidelines. Whatley's actions in Washington were in furtherance of the jointly undertaken criminal activity between her and the defendant and were reasonably foreseeable to the defendant in connection with that criminal activity, the pills seized from Whatley in Tacoma are attributable to the defendant for purposes of calculating the drug quantity.

    2.    *Drugs Found in the Freezer Bag at the Defendant's Home*

The defendant now asks this Court to believe that the drugs found in her home, in her dresser drawer, with her clothes, did not belong to her and should not be considered in calculating the drug quantity under the Guidelines. First, even if the defendant's claim is true, which the United States does not concede, her efforts to store drugs on behalf of other individuals does not divest her of the consequences of those drugs, rather it makes her a co-conspirator and/or an aider and abetter. As set forth above, the defendant has admitted that she worked with another group of drug traffickers, was aware of their specific activity, and stored drugs for them in her house. Accordingly, even under the defendant's version of events, these drugs should be considered as relevant conduct.

However, defendant's claim that the drugs did not below is questionable. The pictures submitted with the *United States' Sentencing Memorandum* show that the defendant's bedroom was the hub of her drug trafficking activities. The drugs in question were found in her dresser, in her bedroom. The defendant had sold drugs on multiple occasions to a CI prior to the search, thereby showing that she has access to significant quantities of drugs for sale. Accordingly, the United States submits that the freezer bag of drugs found in the defendant's residence belonged

to her and should be considered as relevant conduct in calculating the Guidelines.

B.   The PSR Properly Calculates the Defendant's Criminal History

Without citing any support, the defendant argues that her criminal history is over-representative and that the Sentencing Commission could not have intended for dated sentences to impact a defendant's criminal history score. *See Defendant's Sentencing Memorandum*, p. 8; *Defendant's Objections*, p. 11.  However, the defendant's criminal history was calculated using precisely the criteria established by the Sentencing Commission.  Her criminal history score reflects that she is a recidivist offender, who cannot or will not abide by the terms of probation imposed following her convictions.  The custodial sentences on her 2001 and 1996 convictions, PSR ¶¶ 60, 63, fall squarely within the 15 year prior the instant offense.  The defendant's 1988 conviction is properly considered in calculating the defendant's criminal history.  The inclusion of these points is not as a result of some flaw in the California Parole System, as defendant contends, but due to the defendant six parole violations that resulted in a term of incarceration within the 15 year period prior to the instant offense conduct.

C.   Defendant's Claims Regarding The Source of the Cash Found At Her Home Are Further Instances of the Defendant Obstructing Justice and Falsely Contesting Relevant Conduct

The defendant professes not to contest forfeiture but then presents arguments as to the sources of the cash, in an effort to demonstrate that the cash at issue was legitimate, not forfeited drug proceeds. *See Defendant's Sentencing Memorandum*, p. 10.  She has attempted to allocate the various piles of money found in her home, or the greatest portion of them, to her "husband" Eddie Callin and her friends Robert Spiller and Diane West.  Her motive is two-fold.  First, she now attempts to demonstrate that the cash was legitimate, not forfeitable drug proceeds, in support of her argument that she had not financial motive to engage in drug trafficking.  Second, she is attempting to bolster any third-party claims for Callin, West, and Spiller, who she will likely thereafter attempt to manipulate to have them give her the money[2] if any are successful in

---

[2] Simpson has a proven facility to obtain money from Spiller.  She successfully convinced Spiller to give her $125,000, claiming that she was opening a senior center.  Similarly, she has a close financial relationship with West, who is listed as the purchaser with Callin on the

their third party claims for the forfeited money. The ownership and validity of any third party claims will be decided in an ancillary proceeding at which these third parties can present evidence and sworn testimony in support of the claims now made by the defendant. The United States does not seek to litigate the question of ownership in this filing. However, it does seek to show this Court that the defendant's current claim that the money found in her home belonged to others and therefore shows that she was not motivated to engage in drug trafficking by financial gain should not be credited. Further, the defendant false statements in connection with forfeiture are further grounds to support an obstruction of justice enhancement and no reduction for acceptance of responsibility.

First, the defendant was motivated by financial gain. In the transactions in which she sold oxycodone to the confidential informant, she *sold*, she did not give, oxycodone for $10-15 per pill. On April 5. 2011, the CI paid Simpson $4,800 for 478 30 mg oxycodone pills (14.9 g). On June 6, 2011, three days before the search at the defendant's home and seizure of the cash at issue, the CI paid Simpson $3,000.00 for 199 30 mg oxycodone (6.1 g). Further, when the defendant's home was searched, a large freezer-size bag of oxycodone containing 150.9 grams -- over 10 times the amount she sold to the CI on April 5, 2011 -- was found in her home, most of it in her bedroom dresser. Possession of this large quantity is consistent with ongoing drug sales and access to cash that would permit a purchase of this quantity.

Second, several bags of money were found through the defendant's residence, all with varying denominations. At the time of the search, Simpson was asked about the various bags of money found throughout her house, including in her safe. At that time, she identified the bags, including the bag containing $99,9000, as bags belonging to Whatley. *See* Attachment 1, Statement of Simpson. *See also Declaration of Special Agent Kristen McLeran in Support of An Application For A Preliminary Order of Forfeiture*, Dkt No. 123, ¶¶ 10d-f, ("At the conclusion of the search, Simpson was given an inventory of the items seized. When looking through the inventory, Simpson identified the bag that contained approximately $99,900 in rubber-banded

---

house in which the defendant resides.

bundles within a red, silky draw-string bag (Exhibit 12) (that was found in the safe) as belonging to co-defendant Whatley. She also identified the bag that contained approximately $29,960 in rubber-banded bundles in a small purse (Exhibit 4) as belonging to Whatley. SIMPSON said that the red bag in the safe had been given to her by Whatley to hold approximately one week ago. SIMPSON said that the bag under the dresser was given to SIMPSON by Whatley the day before the search."). Now, with the passage of time, the defendant has created another version of events, one which is predictably crafted to give her, through her friends, access to the larger bags of money seized from her home. Specifically, the defendant now falsely claims that she was holding two bags containing approximately $30,000 and $65,000 that belonged to co-defendant Kim Whatley and that the bag of money containing $99,000 (previously identified as one of the two Whatley bags) contained a combination of money from West, gifts from Spiller, and retirement savings of Callin. *See Defendant's Objections*, pp. 5-6. The defendant has previously made similar statements, under oath, to DEA in an administrative filing contesting forfeiture. *See* Attachment 2 and 3 Defendant's Administrative Forfeiture Claims.[3] Just as it was false then, it is false now. When asked about these bags on the day of the search, when she had every reason to explain that the bags contained "legitimate money," not money belonging to a known drug trafficker, she never identified the bag as belonging to West, Spiller, or Callin. Rather, she unequivocally identify the bag in question as belong to Whatley.

       Third, in support of her argument, the defendant attaches what she purports is a statement of Spiller in which Spiller claims to have given the defendant $250,000 in gifts. The defendant then attaches a $125,000 check. Spiller was previously interviewed and stated that he gave

---

[3] The defendant made other false statements regarding her the money seized in this forfeiture claim. For example, in her Claim, she states, under penalty of perjury, that on December 17, 2010, she made a cash withdrawal of $53,840.49 from her Wells Fargo bank account and thereafter placed $53,840 into her safe for safekeeping. See *See* Attachment 2, Defendant's Administrative Forfeiture Claim, p. 3. In fact, bank records, which were identified for counsel before the defendant opted not to contest forfeiture, show that on December 17, 2010, Mr. Callin withdrew $53,840.49 from that bank account, obtained a cashier's check for exactly that amount, and on that same day, used that check as a deposit for a house, which he bought (as an "unmarried man") with Diane West. *See* Attachment 4, Callin Withdrawal and Cashier Check for House Deposit.

MEMO IN REPLY TO DEFENDANT'S OBJECTIONS AND SENTENCING MEMORANDUM,
CR 11-0832 SI        7

1  Simpson $125,000 for a business she claimed to be starting and another loan, that has not yet
2  been repaid, $6,000. *See Attachment* 5, Spiller interview dated June 4, 2012. Notably, Spiller
3  did not reference gifts of $250,000 in his interview. Further, the Spiller check for $125,000 was
4  deposited into the defendant's bank account, not cashed and strewn about the defendant's home
5  in various bags. *See Attachment* 8, Spiller check and record of deposit. The defendant's use of an
6  unsworn statement, purportedly from Spiller, should not be the basis on which this Court credits
7  the defendant's claims that she was not motivated by financial gain.

8        The defendant also claims that the funds in her house her tens of thousands of dollars of
9  cash from her "husband's" retirement accounts. This claim is not supported by bank records.
10 The defendant's husband received three checks from his retirement accounts from 2009 - 2011.
11 In March 30 2009, he deposited a check for $3,560 from American Funds in his and the
12 defendant's bank account and withdrew $2,560.00 in cash. On January 16, 2010, Callin appears
13 to have cashed a check for $4,524 from American Funds. The defendant apparently seeks to
14 have this Court believe that the $2,560 withdrawn in March 2009 and $4,524 cashed in January
15 2010 sat dormant in the Hayward house (which wasn't even purchased as of 2009) until June
16 2011, when the house was searched. Finally, the bulk of Callin's withdrawals from his
17 retirement account were deposited in a bank account, not cashed, as defendant suggests. On
18 March 9, 2011, Callin deposited a check for $17,376.70 from American Funds account into his
19 and the defendant's bank account and withdrew $376.70 in cash. As the bank records show, the
20 bulk of Callin's money went into his and the defendant's bank account, not in bags and safes in
21 their Hayward home. *See* Attachment 6, Callin Retirement Checks / Deposits.

22       Finally, the defendant claims that Diane West gave her sums of cash, which comprised
23 some of the money seized. Diane West has given the defendant money, by check. That Diane
24 West knows how to write a check, and has done so to the defendant, undercuts the defendant
25 claim that her dealings with West are in cash. *See* Attachment 7, West checks to defendant.

26       The defendant has shown through this case that she will take any opportunity to lie to
27 achieve her goals. Just as this Court did not credit her husband's claims, nor should it credit her
28 claims with respect to money.

  D.  Defendant's Objections to the Oxycodone Guidelines Do Not Warrant a Variance

The defendant has also objected to the manner in which the Sentencing Guidelines calculate the Guidelines for oxycodone. *See Defendant's Objections to the Oxycodone Equivalency Ratio,* Dkt. No. 127. In summary, the defendant claims that the Guidelines' 6700 to 1 (actual) marijuana equivalency ratio for oxycodone is devoid of any empirical basis, was the product of flawed and unsupported amendments to the Sentencing Guidelines, and leads to unwarranted sentencing disparities. While the defendant advances a comprehensive argument, the defendant's disregards that courts who have heard the virtually same or similar challenges to the Guidelines have rejected this argument and acknowledged the deference given to Congress and the Commission to determine the Sentencing Guidelines. Furthermore, as discussed herein, the rationale of the Sentencing Commission in setting and thereafter amending the Guidelines applicable to oxycodone was not an empirical error but rather the result of a deliberate process, intended to recognize the dangers of oxycodone and punish offenders for distribution of this highly addictive narcotic drug.

  1. *Courts Have Considered and Rejected the Defendant's Objection*

The argument now advanced by the defendant challenging the drug equivalency ration for oxycodone has been made before and rejected by other courts. *United States v. Vigil*, 832 F. Supp. 2d 1304, 1322-1332 (D.N.M. 2011). The Court found that

> Given the peculiarities of the oxycodone market, the Sentencing Commission made a rational and reasonable decision to amend the guidelines and require consideration of the actual amount of oxycodone as opposed to the total weight of the mixture of substance. Additionally, the nuances of this policy decision make it one that the district courts should not readily make, as it turns on the intricacies of the oxycodone market - intricacies which the Court does not have the resources to properly evaluate.

*Id*. at 1327. Further, the *Vigil* court held that the marijuana equivalency ratio did not result in a disproportionate sentencing disparity. *Id*. at 1332. The defendant references the *Vigil* case in his Objections as having adopted certain findings of fact, but fails to reference that the *Vigil* court rejected the very argument that he now makes. Citing to *Vigil*, the First Circuit has recently affirmed the application of the oxycodone Guideline framework, rejecting an argument similar to the one now made by the defendant. *See United States v. Landorn-Class*, No. 10-2462, 2012 WL

3711549, at *10-11 (1st Cir. August 29, 2012).

2.     *Sentencing Guidelines' Treatment of Oxycodone*

The Sentencing Guidelines currently view one gram of oxycodone (actual) as equivalent to 6700 grams of marijuana. *See* USSG §2D1.1, comment (n.10(E)). This equivalency standard was reached after a series of amendments to the Guidelines. The United States does not contest the stated enactment history of the Guidelines set forth by the defendant. However, the defendant has failed to consider that the Commission, in establishing equivalency ratios for oxycodone, acted purposefully, not arbitrarily.

a.     <u>1987 Amendments</u>

As the defendant correctly states, in 1987, the Commission promulgated equivalency tables for a number of drugs, including oxycodone. However, a critical aspect of the defendant's objection is his assumption that the drug equivalency tables were based on pharmacological equivalence. *Defendant's Objections to the Oxycodone Guideline*, Dkt. No. 127, p. 5 ("The implication from this note is that the Commission sought to use pharmacological equivalents."). Although there may be some evidence[4] to support the assumption that the original oxycodone-heroin equivalency ratio was based, at least in part, on analgesic equivalence, the defendant has not cited to any authority suggesting that the Commission should be bound to proportionality with solely respect to pharmacological equivalence. Where precise explanations of the Guidelines' rationale are lacking, courts generally look to the Commission's stated purpose and broad methods in drafting the Guidelines. *See Rita v. United States*, 551 U.S. 338, 350 (2007) ("The Commission's work is ongoing. The statutes and the Guidelines themselves foresee

---

[4] The pharmacological basis for the ratio may have some foundation considering the Notices published by the Sentencing Commission that "to determine these finer distinctions, the Commission consulted numerous experts and practitioners, including authorities at the Drug Enforcement Administration, *chemists*, attorneys, probation officers, and members of the Organized Crime Drug Enforcement Task Forces, who also advocate the necessity of these distinctions." Further, between the first and second Notices, the oxycodone to heroin ratio was changed from a 1:1 ratio to a 1:.5 ratio. *See* Attachment 9, Excerpts of Sentencing Commission Notice of Guidelines, dated May 13, 1987, 52 Fed. Reg. 18046, 18064 and Attachment 10, Excerpts of Sentencing Commission Notice of Revision to Guidelines, dated November 20, 1987, Fed. Reg. 44674, 44693, 44695.

continuous evolution helped by the sentencing courts and courts of appeals in that process. . . . . The Commission will collect and examine the results. In doing so, it may obtain advice from prosecutors, defenders, law enforcement groups, civil liberties associations, experts in penology, and others. And it can revise the Guidelines accordingly."). Because the Commission is part of the judiciary, and it bases its decisions in experience, not hard science, it seems unlikely that pharmacological principals are the strict, sole basis for the non-statutory equivalency ratios, much less that courts should hold the Guidelines' to the strict standards of science. As the *Vigil* court found: "While those in the pharmacological field would not likely adopt the same system of marijuana equivalency ratios, their goals, objectives, and training are different than those who work in the criminal justice system." *Vigil*, 832 F. Supp. 2d at 1322.

    b.    <u>Amendment 517 Does Not Apply to Oxycodone</u>

Defendant argues, again without support, that the 1997 change to the Guidelines in Amendment 517 was an open admission by the Commission that sentencing based on total mixture weights was illogical. Again, the defendant goes to far in his argument that the Commission's action with respect to *certain* drugs was an general statement that all prescription drugs should be similarly treated. In Amendment 517, the Commission carved out certain categories of drugs, which did *not* include oxycodone, for which the Guidelines would thereafter be calculated based on the number of pills. Defendant overreaches in her claim that the rationale behind Amendment 517 "applied logically" to opiates, such as oxycodone and this speculation should not be credited.

    c.    <u>2003 Amendments</u>

Prior to 2003, however, the Guidelines operated on a 500 to 1 marijuana equivalency ratio for oxycodone, such that, for sentencing purposes, one gram of oxycodone was equivalent to 500 grams of marijuana. *See, e.g.,* United States Sentencing Commission, Guidelines Manual, §2D1.1, comment (n.10 (d)) (Nov. 2002). As it did with both heroin and morphine, the pre-2003 500 to 1 ratio included the entire weight of the mixture and substance in which the oxycodone was contained.

In 1995, the FDA approved OxyContin, a formulation of single-entity, controlled-release

oxycodone that was patented by Purdue Pharmaceuticals. OxyContin was unique in the market for approved pharmaceuticals containing oxycodone for several reasons. First, OxyContin was the first FDA-approved oral dose of single-entity oxycodone -- the first pill to contain oxycodone as its sole active ingredient, not diluted by other non-opiate ingredients such as aspirin or acetaminophen. While OxyContin was designed to be a controlled-release dosage, it was a simple matter for OxyContin abusers to defeat the time-release feature by crushing the pills. This made it easier to abuse orally, and easier to misuse by smoking, snorting or injection. Second, OxyContin was not only "pure," but also offered much stronger doses of oxycodone than had previously been available on the market. The drug was initially sold in doses of 10, 20, 40 and 80 milligrams. Thus, these pills contained 200%, 400%, 800% and 1600% more oxycodone than any previously available drug (such as Percodan, Percocet or Tylox).

In November 2003 the Sentencing Commission enacted Amendment 657, which increased the marijuana equivalency for oxycodone to 6700 to 1. Under the new guideline, however, only the actual amount of the oxycodone is considered in determining the offense level. *See* USSG amend. 657. As the Sentencing Commission explained, this amendment was designed to address proportionality issues stemming from differences in total pill size compared to amount of actual oxycodone. USSG amend 657. *See* Attachments 11 and 12, Sentencing Commission Public Meeting Minutes dated January 8, 2003 and March 26, 2003; *see* Attachment 13, 68 Federal Register 26973 (May 16, 2003). The amendment served to reduce sentences for larger tablets containing comparatively smaller amounts of oxycodone, while increasing sentences for smaller tablets containing a higher concentration of the actual drug. *Id.*

To arrive at the 6700 to 1 ratio, the Sentencing Commission simply maintained the penalty for a 10 milligram OxyContin pill having a total weight of 135 grams. *See id.* Moreover, the new 6700 to 1 (actual) ratio does not materially increase the punishment associated with oxycodone offenses. Rather, the amendment simply changes the focus from the weight of mixture and substance to that of the actual drug. While the new ratio certainly represents an increase in punishment for tablets containing high concentrations of oxycodone, ss the Commission itself notes in Amendment 657, the new ratio actually decreases the punishment

associated with pills containing a lower concentration of oxycodone relative to total weight.

       3.      *The Oxycodone Equivalency Ratio is Independently Justifiable*.

Recognizing the true nature of the oxycodone equivalency ratio as contained in the Sentencing Guidelines, one can turn to an evaluation of whether that ratio is independently justifiable. While there is likely some truth to the idea that the availability of oxycodone has increased as a result of marketing efforts, that reality does not mean that the public health concerns related to oxycodone are in any way imaginary. Oxycodone, is not, as the defendant endeavors to portray, a "soft" drug, devoid of the personal and societal evils that are attendant with more traditional "street" drugs. To the contrary, the public health concerns and societal dangers attendant to prescription drug abuse are quite real. *See* National Drug Threat Assessment, available at *http://www.justice.gov/ndic/pubs38/38661/rx.htm#Top*. See also The Alchemy of OxyContin: From Pain Relief to Drug Addiction, The New York Times, July 29, 2001. This Court is well aware of the toll oxycodone takes on individuals, especially young people. *See e.g., Painkiller Abuse by Kids Way Up Study Finds*, Philadelphia Inquirer, October 17, 2012. Rates of addiction to oxycodone are increasing yearly as are the numbers of deaths associated with overdoses of oxycodone. *See http://www.deadiversion.usdoj.gov/drugs_concern/oxycodone/oxycodone.htm*. The accessibility of oxycodone, in contrast to traditional street drugs, contributes to the oxycodone problem in this country. At the retail level, heroin generally sells for around $360 per pure gram, or as little as $140 in bulk. *See* OFFICE OF NATIONAL DRUG CONTROL POLICY, *The Price and Purity of Illicit Drugs: 1981 Through the Second Quarter of 2003*, 73 (2004)   By contrast, DEA reports from 2004 state that OxyContin is regularly sold on the black market for $1 *a milligram*, which would add up to $1,000 a gram. U.S. Department of Justice, National Drug Intelligence Center, *Intelligence Bulletin: OxyContin Diversion, Availability and Abuse*, (August 2004) ("DEA drug price data indicate that diverted OxyContin typically is sold for $1 per milligram. For Example, a 40-milligram OxyContin tablet typically sells for $40"). Meanwhile, heroin is subject to significantly higher costs for the supplier—it requires a considerable production

MEMO IN REPLY TO DEFENDANT'S OBJECTIONS AND SENTENCING MEMORANDUM,
CR 11-0832 SI                                    13

process, is typically grown abroad, and then changes hands many times as its smuggled into the U.S. OxyContin, by comparison, can be purchased with a prescription—in many cases from complicit "pill mills"—in the US on the legitimate market for as little as 1/10 the black market price. Finally, the effects of oxycodone abuse are now being seen in babies who are born addicted to opiate painkillers. *See* Abby Goodnough & Katie Zezima, *Newly Born, and Withdrawing from Painkillers*, N.Y. Times, April 9, 2011 at A1. In sum, while there is undoubtedly enough blame to go around when assessing the damage from oxycodone, it does not follow that the Sentencing Commission is prohibited from taking into account all of this information when setting penalties for illegal distribution of oxycodone.

    4.    *Defendant's Arguments Concerning the Applicable Guideline*

Defendant contends that the 6700 to1 (actual) marijuana equivalency ratio for oxycodone is both arbitrary and capricious and results in disparate guideline sentences which are overly harsh relative to sentences for similar conduct. Defendant's primary argument against the 6700 to 1 (actual) ratio is that the marijuana equivalency ratio for chemically similar substances, including heroin, percocet, and codeine, is far lower. By way of example, the defendant argues that if she had been in possession of an "equianalgesic" dose of heroin, the penalties would be receive a lower sentence. This line of argument, however, is somewhat misleading. Indeed, without more, a comparison of the current oxycodone ratio with those for other opiates such as morphine, heroin and codeine is to compare apples and oranges for the simple reason that, as discussed above, the oxycodone guideline applies only to the *actual amount of the drug*. By contrast, the current equivalency ratio for heroin, morphine or even codeine applies to the entire mixture or substance in which the drug is found in a detectable quantity. This is a material distinction.

Defendant makes several alternate proposals for the Court to consider in setting a Guideline range. First, the defendant asks this Court to use a per pill approach, even though the Commission declined to use that approach for oxycodone and the defendant has failed to cite any courts that have accepted this approach. The defendant also suggests an alternate marijuana

equivalency standard, again without citing to a single court that has followed the proposal.

E. The Section 3553(a) Factors Do Not Warrant a Further Variance in This Case

In her Sentencing Memorandum, the defendants contends that she won't reoffend if given structure. However, her past belies that argument. This defendant has a history of re-offending, not simply by sustaining new convictions, but by repeatedly violating probation, including for drug-related convictions.

The defendant further contends that the public is safest when she is "out on the street," working to reduce the number of drug addicts. This claim smacks of hubris and the complete and utter disregard for the impact that her drug sales had on the communities into which she and her co-conspirators sold drugs. The defendant's sales of drugs during the period under investigation in the instant case, while she was "out on the street," likely caused of drug addicts to relapse or continue their habits and may have begun the habits of other drug abusers. The public is not safer with this defendant out of custody. She has shown that she has consistently put herself and others at danger through her drug use and drug sales.

The defendant also seeks a variance based on possible health issues, for which she has been undergoing testing for months on end. That she may, like everyone in society, have possible health issues in her future, is not a basis to depart further from the Guidelines. Furthermore, if the defendant does have health issues that require attention during her term of incarceration, the Bureau of Prisons has excellent health facilities that can address any health issue that may arise.

DATED: December 11, 2012         Respectfully submitted,

                                 MELINDA HAAG
                                 United States Attorney

                                 _____/s/_____
                                 DENISE MARIE BARTON
                                 Assistant U.S. Attorney

MEMO IN REPLY TO DEFENDANT'S OBJECTIONS AND SENTENCING MEMORANDUM,
CR 11-0832 SI                         15